# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **AMISTAD DJIMON VENEY,** <br><br> Defendant. | Case No. 19-cr-302 (CRC) |

## OPINION AND ORDER

Defendant Amistad Veney moves to suppress the loaded pistol that police recovered from him during his arrest last September. Mr. Veney contends that the gun was fruit of an illegal seizure and thus subject to suppression. Specifically, Veney argues that he was detained without reasonable suspicion when, after he made clear that he did not wish to engage with one of the police officers, that officer stated: "No. I just want to make sure you don't got no guns." The Court agrees with Veney that the officer's statement, in the context of the surrounding events, constituted a show of authority that would lead a reasonable person to believe that he was not free to walk away. However, because Veney did not submit to that show of authority, the Court finds that he was not "seized" for purposes of the Fourth Amendment until seconds later, when the officer blocked his path. Prior to the moment of seizure, the officer observed an abnormal bulge in Veney's waistband, and therefore had reasonable suspicion to briefly detain him and perform the pat-down that ultimately revealed the pistol. Accordingly, the Court will deny Veney's motion to suppress.

I.   **Factual Background**

   A.  Findings of Fact

The following findings of fact are based on (1) the testimony of Officer Nelson Torres, the sole witness who testified during the suppression hearing held on January 10, 2020; (2) the evidence presented at the hearing, including the body-worn camera footage from the officers who were present for Veney's arrest and the photos taken at the time of his arrest; and (3) the evidence submitted by the defense after the hearing.

On September 8, 2019, at approximately 3:30 p.m., Metropolitan Police Department Gun Recovery Unit ("GRU") Officers Nelson Torres, Merissa McCaw, James Jacobs, and Matthew Hiller were on patrol in an unmarked police car. Tr. of Jan. 10, 2020, Hr'g on Mot. to Suppress ("Tr.") at 12–13, 65. In Officer Torres's experience, although the police car was unmarked, people in the neighborhoods frequently patrolled by the GRU are nevertheless able to identify its cars as police vehicles. Id. at 18. Officer Torres was seated in the front passenger seat and, like the other officers, wore jeans and a tactical vest that identified him as a police officer. Id. at 15, 17; Def. Exh. 15 – Officer Hiller's Body-Worn Camera Footage ("Hiller Video") at 22:54:31–22:54:49.[1]

---

[1] As noted at the evidentiary hearing, the time-stamp marked on the body-worn camera footage is incorrect. Though the video from Officer Torres's body-worn camera lists the time of the encounter as 22:51 Zulu-time (or Greenwich Mean Time), Officer Torres testified that the Zulu time stamp was inaccurate, and explained that encounter actually occurred at 3:36 p.m. Tr. at 30. Additionally, the Zulu-time recorded by each officer's video is off by a few seconds (for example, the moment recorded at 22:51:00 by Officer Torres's camera is recorded as 22:51:03 by Officer McCaw's camera). Id. at 82. So that the parties can easily follow the Court's citations, it will cite to the Zulu time-stamps listed in the upper righthand corner of the videos, even though those timestamps do not accurately reflect the time of the encounter and even though they differ among the various officers' video footage.

The officers drove up to an apartment complex located in what Torres described as a "high-crime area" in the District of Columbia's Fifth District and parked approximately 60 feet from the apartment complex's courtyard, where half a dozen people were standing. Tr. at 12, 14–15. Officer Torres testified that, from his vantage point in the front seat of the car, he observed Veney conduct a hand-to-hand exchange with a man wearing a Washington Redskins jersey and, though he could not see the objects exchanged, suspected that he had witnessed a drug deal. Id. at 15–16. Although Officer Torres's body-worn camera was recording at the time, these events were not captured by the camera due to his seated position in the car and the distance to the apartment complex. Id. at 27–28. In the recorded radio communications between the officers, there is no mention of an observed drug exchange. See Def. Exh. 15, Radio Recording. There is, however, an apparent reference to an illegal game of dice.[2] See id.

Officer Torres testified that Veney looked "over his shoulder appearing to look in the direction of [the police] car that was parked" and then "began to separate himself from the large group of individuals" gathered outside the apartments, walking toward Benning Road, in the opposite direction of the officers' car. Tr. at 17–18. When Veney started to leave the courtyard of the complex, Officers Torres, McCaw, and Jacobs exited their car and began to approach him, with Officer Torres leading the way. Id. at 18–19, 68; Def. Exh. 15 – Officer Jacobs's Body-Worn Camera Footage ("Jacobs Video") at 22:50:20–22:50:32. From the time the officers exited the vehicle, their body-worn cameras captured the events described.

---

[2] While Veney correctly notes that one of the officers on the radio recording mentions a dice game, the recording does not establish that Officer Torres approached Veney because the officers observed a dice game. The audio quality of the radio recording is too poor to enable the Court to draw any conclusions about the referenced dice game. See Def. Exh. 15, Radio Recording.

3

After Veney left the apartment courtyard, he stopped at the sidewalk intersection to Benning Road and looked at his phone, holding it in one hand and money in the other. Tr. at 69; Def. Exh. 15 Officer McCaw's Body-Worn Camera Footage ("McCaw Video") at 22:50:19–22:50:25. Officer Torres testified that as Veney "started walking . . . on Benning Road," he observed gestures indicating that Veney "was possibly securing something in his front waistband area." Tr. at 19–20. The three officers continued walking toward Veney and the following exchange took place over a period of approximately ten seconds.

> **Officer Torres,** as he walked up to Veney, who was standing still and angled away from Officer Torres: "Big man, you got nothing on you, man?"
>
> **Veney**, while standing still and continuing to look at his phone: "I ain't got shit on me."
>
> **Officer Torres**, while continuing to approach Veney, who remained still: "You mind turning around for me?"
>
> **Veney**, as he began to walk down the street away from Officer Torres: "I'm not, man. Nah, I'm going to walk off."
>
> **Officer Torres**, while walking a few feet behind Veney: "No. I just want to make sure you don't got no guns."
>
> **Veney**, as he walked at the same pace down the street with Officer Torres walking parallel beside him: "I don't got shit on me. What are you talking about? This is a belt."
>
> **Officer Torres**, as he stepped in front of Veney and pointed to his waistband: "What is that big [thing]?"
>
> **Veney**, after stopping and then grabbing and shaking his belt buckle: "This is a belt."
>
> **Officer Torres**, while placing his hands on Veney's chest to keep him in place: "Ok, hold on, hold on."

Gov. Exh. 1, Officer Torres's Body-Worn Camera Footage ("Torres Video") at 22:50:25–22:50:44; McCaw Video at 22:50:19–22:50:55.

4

Officer Torres testified that when he was walking alongside Veney—right after Torres said "No. I just want to make sure you don't got no guns"—he looked "over towards [his] right at [Veney's] front waistband area" and "observed a large abnormal bulge at [Veney's] belly button area where the button of [his] pants would be" as well as "another bulge" near Veney's pants zipper. Tr. at 21. Moments after making those observations, Officer Torres stepped in front of Veney. After Officer Torres placed his hands on Veney's chest, Officer Jacobs restrained his arms, while Torres patted down his front waistband area. Torres Video at 22:50:25–22:50:44. Upon feeling the outline of gun, Officer Torres radioed the rest of GRU officers standing by, advising them of the presence of a firearm. The officers then lifted Veney's shirt, revealing a pistol tucked into his waistband. Id.

Approximately twelve GRU officers were on the scene within minutes after Officer Torres indicated the presence of a firearm. Hiller Video at 22:54:31–22:54:49. While some of the officers continued to restrain Veney's arms, another took photographs of his waistband. Tr. at 24–25. Aside from the brief pat-down conducted by Officer Torres, the officers had not moved the weapon, which was photographed in the position it had been prior to Veney's arrest. Id.; Gov. Exhs. 3–5; Def. Exh. 5. These photographs, which are taken from the front and show Veney wearing dark-colored jeans, do not clearly corroborate Officer Torres's testimony that there was a suspicious bulge in his waistband. Gov. Exhs. 3–5; Def. Exh. 5. Nor is Veney's waistband area distinctly captured on any of the body-worn camera footage. After the police determined that Veney had a prior felony conviction, they confiscated the weapon, which turned out to be a loaded, 9mm semi-automatic pistol. Tr. at 24–25. While no other contraband was found on Veney, police recovered his cellphone and approximately $80 of cash. Id. at 25–26, 69–70.

During Veney's arrest, other civilians were milling around outside of the complex, including the man in the Redskins jersey who Officer Torres testified had conducted a hand-to-hand drug exchange with Veney. Id. at 26. None of the officers approached that man. Hiller Video at 22:51:25–22:58:06. At the hearing, neither the Government nor the defense questioned Officer Torres about why the police chose not to talk to the man in the Redskins jersey or why Officer Torres's police report did not describe the interaction as a drug deal, but merely recorded it as a "hand-to-hand transaction." Tr. at 15–16, 31, 67–68.

## II. Analysis

Veney seeks to suppress the gun and ammunition recovered from his person, arguing that this search was unlawful because Officer Torres lacked reasonable suspicion to seize him prior to the search. Specifically, Veney argues that he was first seized when Officer Torres said, "No. I just want to make sure you don't got no guns." According to Veney, at that moment Officer Torres lacked reasonable suspicion to detain him. The Government retorts that Veney was first detained a few seconds later, when Officer Torres stepped in front of him and thereby forced him to stop walking. The Government maintains that Torres had reasonable suspicion to detain Veney at that time because seconds earlier, when Officer Torres was walking beside him, Torres observed an abnormal bulge in Veney's waistband. To assess the parties' arguments and determine the lawfulness of this encounter the Court must determine: (1) when did the seizure occur?; and (2) when the seizure occurred, did Officer Torres have reasonable suspicion that Veney was involved in criminal activity?

### A. When did the seizure occur?

Because this is not a situation in which an officer used physical force to seize a person, the Court is guided by California v. Hodari D., 499 U.S. 621 (1991). Hodari D. established that

a seizure occurs only if the officer made a "show of authority" such that a reasonable person would not feel free to leave and the defendant actually submitted to that show of authority. Id. at 626 ("An arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority.").

Under the first prong of Hodari D., a show of authority occurs when a "reasonable person in view of all the circumstances surrounding the incident, . . . would have believed that he was not free to leave." United States v. Castle, 825 F.3d 625, 632 (D.C. Cir. 2016). This reasonable person test asks "not . . . what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." United States v. Goddard, 491 F.3d 457, 460 (D.C. Cir. 2007) (per curiam). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554 (1980).

"The Supreme Court has repeatedly held that police do not manifest a show of authority 'merely [by] approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting some questions to him if the person is willing to listen,' provided the officers do not imply that answers are obligatory." Castle, 825 F.3d at 633 (quoting Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion)); see also United States v. Gross, 784 F.3d 784, 786 (D.C. Cir. 2015) (Police officers are permitted to question individuals "as long as the police do not convey a message that compliance with their requests is required." (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). This is because

7

police officers, like other citizens, are permitted "'to address questions to other persons,' although 'ordinarily the person addressed has an equal right to ignore his interrogator and walk away.'" Mendenhall, 446 U.S. at 553 (quoting Terry v. Ohio, 392 U.S. 1, 31, 32–33 (Harlan, J., concurring)). Accordingly, "if the person refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." I.N.S. v. Delgado, 466 U.S. 210, 216–17 (1984). In short, the exact "nature of a police officer's question[s]," including whether the officer makes "direct accusations of criminal conduct," Gross, 784 F.3d at 786, bears on whether a person has been seized, Gomez v. Turner, 672 F.2d 134, 146 (D.C. Cir. 1982); see also United States v. Miller, No. 16-CR-0072 (KBJ), 2016 WL 8416761, at *8 (D.D.C. Nov. 11, 2016), aff'd, 739 F. App'x 6 (D.C. Cir. 2018) ("This means that the officer's tone and statements might convey a message that rises to the level of a seizure.").

In considering the second prong of Hodari D., whether a person has submitted to an assertion of authority, courts recognize that "what may amount to submission depends on what a person was doing before the show of authority." Brendlin v. California, 551 U.S. 249, 262 (2007). In Hodari D., it was plain to the Court that the defendant's "headlong flight" in response to an officer's assertion of authority was not submission. 499 U.S. at 626 ("[A] policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee . . . is no seizure."). But in other situations, such as if "one sitting in a chair" at the time of the show of authority, submission may be shown "by not getting up to run away." Brendlin, 551 U.S. at 262. In other words, a person's conduct—either an affirmative act or an omission—constitutes submission

8

when that conduct indicates that the person recognizes that he is subject to the power of the officer making the show of authority. [3]

Veney, who bears the burden of proving that he was seized, see Castle, 825 F.3d at 633, contends that Officer Torres made a show of authority when he said "No. I just want to make sure you don't got no guns." Although the question is close given the brevity and conversational tone of the exchange, the Court concludes that a reasonable person in Veney's position would not have felt free to leave. Two features of the encounter between Veney and Officer Torres compel this finding.

First, the sequence of the encounter is significant. To recap: Officer Torres began by asking Veney, in a friendly tone, "Big man, you got nothing on you, man?" Veney responded: "I don't got shit on me." Officer Torres then asked a follow-up question, which indicated that he did not believe Veney's answer, "You mind turning around for me?" Veney also rejected Officer Torres's second request, answering, "I'm not, man. Nah, I'm going to walk off." Plainly, this statement communicated that Veney desired to end his encounter with Officer Torres. But after this unmistakable rebuff, Officer Torres pressed: "No. I just want to make sure you got no guns." Although the first two questions from Officer Torres were permissible given that police officers may "address questions to other persons," the last statement was not because it "impl[ied] that answers are obligatory." Castle, 825 F.3d at 633; Mendenhall, 446 U.S. at 553

---

[3] By requiring that a person submit to an officer's show of authority, Hodari D. arguably changed the standard established in Mendenhall. That is, while Mendenhall established that "ordinarily the person addressed [by a police officer] has an equal right to ignore his interrogator and walk away," 446 U.S. at 553 (internal quotations omitted), if a person ignores his interrogator and walks away, he likely will be unable to show submission, as required to establish a seizure under Hodari D. See Hodari D., 499 U.S. at 638–39 (Stevens, J., dissenting) (arguing that the Hodari D. standard is inconsistent with Mendenhall).

9

(Police officers may "address questions to other persons,' although 'ordinarily the person addressed *has an equal right to ignore his interrogator and walk away*.") (quoting Terry, 392 U.S. at 31, 32–33 (Harlan, J., concurring)) (emphasis added). Because, here, Veney refused to comply with the officer's request and the police took an additional step, which implied that he had no choice but to comply, Officer Torres made a "show of authority" for purposes of the Fourth Amendment. See Delgado, 466 U.S. at 216–17; see also United States v. Beauchamp, 659 F.3d 560, 567 (6th Cir. 2011) ("Beauchamp had indicated that he did not want to speak with the police by walking away two times; a reasonable person would not have felt free to walk away a third time after an officer had given him express instructions to do otherwise.")

Second, the exact nature of the officer's words is important. Crucially, the words Officer Torres used—"No. I just want to make sure you don't got no guns."—were in the form of a statement, not a question or request. While precedent makes clear that "[q]uestions alone . . . ordinarily do not amount to a 'show of authority' sufficient to constitute a seizure," the Circuit has explicitly noted that "direct *accusations* of criminal conduct by officers have weighed in favor of finding a seizure." Gross, 784 F.3d at 788 (emphasis in original). It makes a difference whether the officer was "extending a greeting or positing a question" as opposed to "giving an order in 'language . . . indicating that compliance . . . might be compelled.'" United States v. Wood, 981 F.2d 536, 540 (D.C. Cir. 1992) (quoting Mendenhall, 446 U.S. at 554). The key statement here falls short of being a direct accusation of criminal conduct, but because it is not framed as a question (which admits the possibility that the addressee could decline) and was instead in the form of a statement beginning with "No," it indicated that Veney's compliance might be compelled. See United States v. Hood, No. 19-CR-315 (ESH), 2020 WL 353859, at *4–5 (D.D.C. Jan. 21, 2020) (concluding that a reasonable person would not feel free to leave

10

after an officer stated "Hold on a sec"). In sum, Veney has satisfied his burden of producing evidence showing that a reasonable person in his shoes would not have felt free to leave until he proved to the officer that he did not possess a gun.

While establishing a show of authority is a necessary condition for seizure, it is not sufficient: Veney must also show that he "submi[tted] to the assertion of authority." Hodari D., 499 U.S. at 626. Here, his motion falters. After Officer Torres said "No. I just want to make sure you don't got no guns," the body-worn camera footage shows that Veney continued walking away at the same pace as before. McCaw Video at 22:50:30–22:50:40. Although such behavior is a far cry from the "headlong flight" of the defendant in Hodari D, what conduct counts as submission "depends on what a person was doing before the show of authority," Brendlin, 551 U.S. at 262. Veney's conduct—continuing to walk away from Officer Torres—indicates that he did not acknowledge that he was subject to the officer's authority. Accordingly, because Veney has failed to show that he submitted to Officer Torres's statement, "No. I just want to make sure you don't got no guns," the second prong of the Hodari D. test is not satisfied.[4]

At what point, then, did the seizure occur? The Government argues that Veney was first seized when Officer Torres stepped in front of him, forcing Veney to stop. The Court agrees. When Officer Torres stepped in front of Veney, his conduct constituted a "show of authority" because a reasonable person would not feel free to leave when an officer blocks his path in that manner. See Terry, 392 U.S. at 16 (a seizure occurs when an officer restrains a person's

---

[4] Castle is not to the contrary. There, the D.C. Circuit held that a person who "continued walking after being told to stop" by a police officer had nonetheless submitted to the officer's show of authority because the person "walk[ed] directly" to another officer, in accordance with the first officer's command, and was "not trying to go anywhere." 825 F.3d at 633. Here, in contrast, Mr. Veney was not walking toward another officer in an act of submission, but was still attempting to walk away from Officer Torres.

11

"freedom to walk away"); see also Gross, 784 F.3d at 788 (noting that a person is seized if an officer's actions "block or control the [person's] movement"). And at the moment that Torres stepped in front of him, Veney submitted to Officer Torres's show of authority because he stopped walking. Thus, both prongs of Hodari D. are met.

    B. <u>When the seizure occurred, did Officer Torres have reasonable suspicion that Veney was involved in criminal activity?</u>

Although Veney was seized without a warrant when Officer Torres stepped in front of him, that seizure is nonetheless proper if Officer Torres had reasonable suspicion to detain him. In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court created an exception to the Fourth Amendment's warrant requirement for "brief encounter[s] between a citizen and a police officer on a public street," Illinois v. Wardlow, 528 U.S. 119, 123 (2000). To conduct a Terry stop an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Castle, 825 F.3d at 634 (internal citation and quotation marks omitted). Similarly, an officer may conduct a Terry frisk if the police officer has reasonable suspicion to believe "that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983). The reasonable suspicion standard is satisfied if a reasonable officer would have a "particularized" basis—something greater than an "inchoate . . . suspicion or 'hunch'"—for "suspecting the particular person stopped of criminal activity." Terry, 392 U.S. at 27. In other words, "a Terry stop requires only a minimal level of objective justification, and an officer may initiate one based not on certainty, but on the need to check out a reasonable suspicion." United States v. Edmonds, 240 F.3d 55, 59–60 (D.C. Cir. 2001) (internal citations and quotation marks omitted).

12

When determining whether reasonable suspicion existed, a court must not "separately scrutinize each factor relied upon by the officer conducting the search." Id. Rather, a Court must consider the totality of the circumstances. Therefore, "even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors—especially when viewed through the eyes of an experienced officer—may." Id. An officer's training and experience enable him to "draw[ ] inferences and make[ ] deductions" from seemingly innocuous facts—"inferences and deductions that might well elude an untrained person." United States v. Cortez, 449 U.S. 411, 418 (1981). "It is the Government's burden to provide evidence sufficient to support reasonable suspicion justifying any such stop." Castle, 825 F.3d at 634.

The Court begins with the linchpin of the Government's evidence: Officer Torres's testimony that he observed an abnormal bulge in Veney's waistband prior to seizing him. Tr. at 21. Although Veney correctly notes that an abnormal bulge is not clearly discernible in the post-arrest photos, see Gov't Exhs. 3–5; Def. Exh. 5, the Court nevertheless credits Officer Torres's testimony. As Officer Torres testified, two-dimensional photographs sometimes do not fully capture what the human eye observes. Tr. at 37–38. This is particularly true here, where Veney was photographed from the front, while standing still and wearing dark-colored clothing. It is therefore plausible to the Court that Officer Torres, who observed Veney in motion and from the side, was able to discern an abnormal bulge that simply was not captured in the photographs.[5] Moreover, as a police officer, Officer Torres is guided by experience and training that allow him

---

[5] Because Officer Torres's body-worn camera was situated at the officer's chest level, Veney's waistband was largely out of view at the moment that Officer Torres walked alongside him and observed the suspicious bulge.

to pick up on suspicious bulges that may elude untrained eyes. The Court therefore credits his testimony that he observed an abnormal bulge in Veney's waistband. Plainly, the observance of a bulge that looks like a weapon supplies reasonable suspicion that the person is engaged in criminal activity. See Terry, 392 U.S. at 27.

While Officer Torres's observance of an abnormal bulge is likely sufficient, on its own, to supply reasonable suspicion, there is additional evidence supporting a finding of probable cause. To start, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis," Wardlow, 528 U.S. at 124, though "the fact that a given locale is well known for criminal activity will not by itself justify a Terry stop," Edmonds, 240 F.3d at 60. Moreover, Officer Torres testified that when Veney first started walking down Benning Road, prior to when Torres stepped in front of Veney, he observed gestures indicating that Veney "was possibly securing something in his front waistband area." Tr. at 19–20. Although Veney's exact movements are not clearly captured by any of the officers' body-worn cameras, the Court finds that Officer Torres was generally credible and his account is not contradicted by record evidence.[6]

Considered in the totality, and based on binding caselaw, the Government's evidence—that there was a suspicious bulge in Veney's waistband, that the incident occurred in a high-crime neighborhood, and that Veney was observed making furtive movements to conceal an

---

[6] The parties dispute the probative value of another piece of evidence—Officer Torres's testimony that Mr. Veney recognized the GRU officers and then attempted to evade them by walking away. While headlong flight is certainly "probative of wrong doing if it is both unprovoked and a result of noticing the police," normally, an "individual has a right to ignore the police and go about his business." Wardlow, 528 U.S. at 124–25 (internal quotations omitted). The Court therefore declines to consider Veney's decision simply to walk away from Officer Torres in the Fourth Amendment analysis.

14

object in his waistband—supply reasonable suspicion for an officer to believe that Veney was engaged in criminal activity. Officer Torres was therefore justified in detaining Veney.[7] See Terry, 392 U.S. at 27.

Once detained, Officer Torres was further justified in conducting a brief frisk of Veney's waistband area. Having observed an abnormal bulge in Veney's waistband, Officer Torres had reasonable suspicion to believe that Veney was "dangerous and . . . [could] gain immediate control of [a] weapon." Long, 463 U.S. at 1049; see also Pennsylvania v. Mimms, 434 U.S. 106, 112 (1977) ("The bulge in the jacket permitted the officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer. In these

---

[7] Veney makes much of Officer Torres's testimony that he observed a hand-to-hand drug exchange between Mr. Veney and the man in the Redskins jersey. Tr. at 16. Veney notes that Officer Torres's testimony is not corroborated by the officers' body-worn cameras (because the alleged exchange occurred out of view). He further maintains that the account is undermined by the radio transmissions (which mention an illegal dice game but not a hand-to-hand exchange) and Officer Torres's written report of the incident (which describes observing a hand-to-hand exchange, but neglects to characterize the exchange as a drug deal). Lastly, Mr. Veney notes that none of the officers approached the other alleged participant in the purported drug deal—the man in the Redskins jersey—even though that man waited nearby for over six minutes while Mr. Veney was getting arrested. Hiller Video at 22:51:25–22:58:06. The thrust of this argument is that Officer Torres lied about the reason for approaching Mr. Veney in the first place and that his testimony should therefore be discredited entirely.

Generally, an officer's testimony should be excluded only if "the problems with the officer's account are numerous and bear directly on the contested issue." United States v. Delaney, 651 F.3d 15, 19 (D.C. Cir. 2011). Here, Officer Torres's testimony was largely corroborated by the record evidence; there were not "numerous" problems with his account, but merely an arguable discrepancy regarding one part of his testimony. And that inconsistency—whether Officer Torres chose to approach Mr. Veney because he saw Mr. Veney engage in a hand-to-hand drug transaction—does not "bear directly on the contested issue." Id. Officer Torres did not need reasonable suspicion simply to approach Mr. Veney and ask him a few questions. Castle, 825 F.3d at 633. Rather, the only contested issue is whether Officer Torres had reasonable suspicion to detain Mr. Veney at the time that the officer stepped in front of him. Because there is other evidence to support that conclusion, as addressed above, it is largely irrelevant whether Officer Torres saw Mr. Veney engage in a hand-to-hand drug transaction. Thus, exclusion of Officer Torres's entire testimony is not warranted.

circumstances, any man of reasonable caution would likely have conducted the pat down.") (internal quotations omitted). Lastly, although Veney contends that Officer Torres exceeded the scope of a Terry frisk by manipulating the gun in Veney's waistband, the body-worn camera footage shows that Officer Torres engaged in a proper Terry pat-down, United States v. Rodney, 956 F.2d 295 (D.C. Cir. 1992) (concluding that "a continuous sweeping motion over [the defendant's] outer garments, including the trousers covering his crotch area," was "not unusually intrusive").

## III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [Dkt. No. 13] Defendant's Motion to Suppress is DENIED

**SO ORDERED**.

CHRISTOPHER R. COOPER<br>
United States District Judge

Date: March 13, 2020